## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (the "Agreement") made and entered into the 29th day of January 2021 by and between **NORMAN LANE** ("Norman" or "Seller"), and **CHRISTOPHER LANE**, ("Chris"), and **RONALD LANE INC.** a West Virginia Corporation, ("Company"), Christopher Lane and Company collectively ("Purchaser").

### WITNESSETH:

WHEREAS, Seller, is the owner of five thousand seven hundred sixteen (5,716) total shares of capital stock of the Company. Sellers total shares consist of five thousand six hundred sixty-six (5,666) non-voting shares of capital stock of the Company evidenced by certificate number ___ for two thousand six hundred eighty three (2,683) shares and two thousand nine hundred eighty three (2,983) shares evidenced by certificate number ___, and representing fifty six and 66/100 percent (56.66%) of the issued and outstanding stock and equity of the Company; and fifty (50) voting shares of voting capital stock consisting of thirty three (33) shares evidenced certificate number ___ and seventeen (17) shares evidenced by certificate number ___, and such shares represents one half of one percent (.5%) of the issued and outstanding stock and equity of the Company; and together the shares of the Seller represent fifty seven and 16/100 percent (57.16%) of the issued and outstanding stock and equity of the Company;

WHEREAS the Seller wishes to sell, and the Purchaser wishes to purchase all of the issued and outstanding capital stock of the Company owned by the Seller upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises and agreements contained herein, the parties agree as follows:

### ARTICLE I
### PURCHASE AND SALE OF SHARES

1.1 <u>Sale and Transfer of Shares</u>. Subject to the terms and conditions set forth in this Agreement, on the Closing Date (as defined in Section 6.1 hereof) Seller shall sell, convey, transfer and deliver to Purchaser, and Purchaser shall purchase from Seller,

**Exhibit A**

five thousand six hundred sixty-six (5,666) shares of non-voting capital stock of the Company and fifty (50) shares of voting capital stock of the Company for a total of (5,716) shares of the capital stock of the Company which represents fifty seven and 116/100 percent (57.16%) of the issued and outstanding shares of the capital stock and equity of the Company and unless otherwise set forth herein, free and clear of all liens, pledges and encumbrances of every kind, character, nature and description (the "Shares"). Unless the Purchaser agrees otherwise in writing, the Shares being sold and assigned shall be titled in the name of the Purchaser unless otherwise directed by the Purchaser in writing at closing.

1.2 <u>Purchase Price</u>.   The total purchase price for the Shares being transferred herein by this Agreement shall be Ten Million Eight Hundred Sixty-Nine Thousand One Hundred Ten Dollars ($10,869,110.00).and shall be payable as follows:

1.2.1 At the Closing, Purchaser shall pay Seller, by check, cashier check or certified funds, the amount of Four Hundred Twenty-Two Thousand Four Hundred Fifty Three Dollars ($422,453.00).

1.2.2  On the Closing Date Seller shall assign to Purchaser, Chris, Chris shall assume, the promissory note in the principal amount of Three Million Four Hundred Eighty-One Thousand Six Hundred Seventy-Seven Dollars ($3,481,677.00) payable to Ronald Lane, with an execution date of November 17, 2020 ("Ron Note"). Seller, and Chris, shall execute a novation, assignment and assumption agreement, ("Assignment") a copy of which is attached hereto as Schedule 1.2.2 and incorporated herein by reference, assigning to Chris, and being assumed by Chris any and all of Sellers rights, title, interest and obligations of every kind, character or nature, in and to the Ron Note.  Chris and Company shall indemnify and hold harmless Seller for any and all obligations, liabilities, costs, fees and expenses of every kind, character or nature arising under the Ron Note.  The Assignment shall be in conformity with the authorized assignment provision of the settlement and purchase agreement with Ronald Lane.

1.2.3 On or before the Closing Date, Company shall cause all of the equipment set forth on Schedule 1.2.3 attached hereto, to be transferred and titled in the name of NGL, LLC a West Virginia limited liability company ("NGL") a wholly owned entity of Company.  The transfer of the equipment to NGL shall be on an "as is" basis,

2

**Exhibit A**

free and clear of any and all liens and encumbrances of any kind character or nature. Seller and Purchaser understand and agree that the transfer of the titles may not be complete as of the Closing Date but shall in any event be completed on or before the 26th day of February 2021.  Seller and Purchaser understand and agree to cooperate and to execute any and all documents necessary to transfer the equipment.  Seller shall, as of the Closing Date, be permitted to begin coordinating transport of the equipment set forth on Schedule 1.2.3.  Seller shall coordinate the transport of the equipment and assets set forth on Schedule 1.2.3 with the Company's transports at no cost to Seller and such transport of the equipment shall be completed as soon as possible, without major disruption to the Company's daily business and in any event on or before February 12, 2021 and the transport of the pipe (included in the equipment list) shall be completed no later than February 26, 2021.  The equipment being transferred herein shall be in its AS IS condition and without representation or warranty of any kind regarding its condition.  Seller agrees to procure insurance for the equipment as soon as possible and in any event within seven (7) days of transfer of title to NGL, LLC.   Company agrees to maintain the insurance on all the equipment until completion of transfer of title and notice thereof to Seller.  The parties agree and understand that the value of the equipment set forth on Schedule 1.2.3 is Eight Hundred Eighty-Eight Thousand Three Hundred Twenty Dollars ($888,320.00).

1.2.4 On or before the Closing Date, Purchaser shall cause the Company to issue a Special Warranty deed transferring any and all rights, title and interests of the Company in and to the property know by the parties as the Barnes Run Property, lying in  District 3 (Lee District) Calhoun County West Virginia identified as Map 12 Parcel 2, Parcel 2.8, Parcel 2.9, Parcel 2.10, Parcel 2.11, Parcel 2.12, Parcel 2.13, Parcel 2.15, and Parcel 2.18, and being the same property conveyed to the Company by deed dated the 16th day of November 2018, in the office of the Clerk of the County Commission of Calhoun County West Virginia in Deed Book 274 at page 115, to be transferred into NGL, LLC. Company shall transfer its entire interest in the property free and clear of all liens and encumbrances to NGL, LLC. Transfer of the property shall be of all right title and interest of the Company including, but not limited to, any and all mineral rights, coal, oil and gas located beneath the surface of the property.  Seller and Purchaser understand and agree that the transfer of the title may not be complete as of the Closing

3

**Exhibit A**

Date a result of the setup of NGL, LLC, but shall in any event be completed within three business days of the Closing Date or the date of creation of NGL, LLC, whichever is later.  The parties understand and agree that the value of the Barns Run Property for purposes of this transaction upon transferred to the NGL, LLC shall be Five Hundred Seventy Thousand Dollars ($570,000.00).

1.2.5  Limited Warranty of Title.  The title to the Barns Run Property shall be subject to all matters appearing of record or that can be ascertained by an inspection thereof and shall be conveyed to NGL, LLC  without any warranty of title, express or implied, except that the Company will warrant clear title, for its interests in the Barns Run Property, to NGL, LLC against any action by any party claiming an interest in the Property or any part thereof by, through or under the Company.   The cost of title insurance, if requested by NGL, LLC, shall be borne by NGL, LLC.

1.2.6 Assets to be Conveyed As Is Without Warranty.  THE BARNS RUN PROPERTY AND EQUIPMENT TO BE TRANSFERRED TO NGL, LLC IS TRANSFERRED "AS IS" AND THE COMPANY MAKES NO WARRANTY OR REPRESENTATION, WHETHER EXPRESS OR IMPLIED IN FACT OR IN LAW, OF MERCHANTABILITY, FITNESS FOR ANY PURPOSE, STATE OF REPAIR, CONDITION OR SAFETY OF THE REAL OR PERSONAL PROPERTY, NOR COMPLIANCE WITH APPLICABLE LAW, RULE, ORDER AND REGULATION, CONCERNING SUCH ASSETS.

1.2.7  Purchaser shall on the Closing Date cause the Company to assign and transfer all right title and interest in and to the shareholder loan of Norman Lane ("Shareholder Note") to NGL, LLC. The Assignment shall be evidenced by an assignment and transfer agreement a copy of which is attached hereto as Schedule 1.2.7.  The parties understand and agree that the value for purposes of this transaction the Shareholder Note transferred to NGL, LLC shall be Three Hundred Thirty Thousand Dollars ($330,000.00). Seller and Purchaser understand and agree that the transfer and assignment of the Shareholder Note may not be complete as of the Closing Date as a result of the setup of NGL, LLC, but shall in any event be completed within three business days of the Closing Date or the date of creation of NGL, LLC, whichever is later.

4

**Exhibit A**

1.2.8 The Company shall, as partial payment of the Purchase Price, adopt a resolution authorizing the exchange of the ownership of NGL, LLC as partial payment for Seller's shares of capital stock in the Company as of the Closing Date or immediately after all assets set forth above in Sections 1.2.3, 1.2.4 and 1.2.5 above, have been transferred and titled in NGL, LLC, whichever is later. Such transfer shall further be free and clear of all liens and monetary encumbrances.

1.2.9 At Closing, Chris shall execute two promissory notes in favor of the Seller, Note A in the principal amount of Three Million Dollars ($3,000,000.00) and Note B in the principal amount of Two Million Three Hundred Sixty-Three Thousand Dollars ($2,363,000.00). Note A and Note B shall be referred to singularly as" Note A and  Note B" and collectively as the "Promissory Notes".   Company shall Guarantee the payment of the Promissory Notes.

1.2.10 Note A, a copy of which is attached hereto as schedule 1.2.10 shall be in the principal amount of Three Million Dollars ($3,000,000.00), shall be interest free for a period of three hundred sixty (360) days from the Closing Date, and shall be due and payable in four (4) installments.  The first installment shall of Fifty Thousand Dollars ($50,000.00) shall be paid on the Closing Date.  The second installment of Seven Hundred Fifty Thousand Dollars ($750,000.00) shall be due and payable on May 29, 2021; the third installment of One Million Two Hundred Thousand Dollars ($1,200,000.00) shall be due and payable on September 26, 2021; and the final installment of One Million Dollars ($1,000,000.00) shall be due and payable on January 24, 2022. In the event any installment of Note A is not made when due, Seller shall provide Chris and Guarantor written notice of such default and Chris and Guarantor shall have thirty (30) days from the date of notice to cure such default.  Any failure on the part of Chris and or the Guarantor to make any payment when due, and such payment is not cured within thirty (30) days of the date of written notice of default, shall constitute a default under this,  Promissory Note A and the security instruments and shall entitle Seller or the holder thereof to any and all remedies available under this Note A, the Collateral Agreements  or under applicable law. Additionally, upon default, Note A shall be subject to a default rate of interest equal to ten percent (10%) per annum on the unpaid principal balance of Note A.  Note A shall be secured by and in accordance with the provisions of Article II of this Agreement.  Upon the occurrence of

5

**Exhibit A**

an uncured Default on Note A, Seller shall not execute upon the Shares of the Company pledged as security unless the other collateral securing Note A is insufficient to satisfy the Default amount including but not limited to any acceleration of Note A.

1.2.11 Note B, a copy of which is attached hereto as schedule 1.2.11 shall be in the principal amount of Two Million Three Hundred Sixty-Three Thousand Dollars ($2,363,000.00) with interest thereon at a rate of three percent (3%) per annum and shall be amortized over a period of ten (10) years. Note B shall be without interest for the period beginning on the date of Note B and ending on February 5, 2022. Borrower shall pay principle and interest payments on Note B in the amount of Twenty Two Thousand Eight Hundred Seventeen and 30/100 Dollars ($22,817.30) beginning on the 5th day of February, 2022 and a like sum on the same day of each calendar month thereafter, until the 5th day of February, 2032, at which time the entire amount of principal debt and interest then remaining unpaid shall be due and payable, said payments to be first applied to interest accrued to date of payment and the balance to the reduction of the principal debt hereof. Note B shall provide that any payment not received by the 5th of the month in which it is due shall be a default thereunder and Seller shall provide written notice to Chris and Guarantor of said default. Chris and or Guarantor shall have fifteen (15) days from the date of written notice of default to cure such default. Any default in the payment of Note B which is not timely cured shall entitle Seller or the holder thereof to any and all remedies available under this Note B and the collateral agreements and or under applicable law. In the event that Chris and or Guarantor fail to timely make the monthly payment on Note B on three (3) occasions within any running twelve-month period of time, Seller shall, at holder's option declare the entire amount of principal and then accrued interest on Note B to be immediately due and owing. Additionally, upon default in payment under Note A or Note B, the Note and or Notes defaulted upon shall be subject to a default rate of interest equal to ten percent (10%) per annum on the unpaid principal balance of the defaulted upon Note. Note B shall be secured by and in accordance with the provisions of Article II of this Agreement.

1.2.12 Seller, Chris and Company understand and agree that Note A and Note B shall be cross collateralized. By way of clarification, a default under Note A,

**Exhibit A**

Note B or any of the Loan Documents as defined in the Promissory Notes shall cause Seller to execute upon the Collateral under the defaulting Note.

1.2.13 Company shall transfer, assign, and set over the ownership of the cell phones, current cell phone numbers, laptops and iPads of Kristy Lane and Norman Lane to be transferred to Norman Lane within three (3) business days of the Closing Date.  Seller and Company shall coordinate the transfer of ownership of cell phones, cell phone numbers, iPad, and laptops to the Seller.  Seller shall coordinate, cooperate and assist in the transfer of the Company information located on the three devices to the Company, which transfer shall be performed by the IT Department of Company's Accounting firm Arnett, Carbis and Toothman, LLC at RLI Headquarters on Tuesday February 2, 2021.  Parties will remove from Seller's devices any Company information but shall not copy or retain any personal information of the Seller and Kristy.   Seller shall be responsible for securing separate service for the devices.

1.2.14 Subject to the provisions of Article II of this Agreement, on the Closing Date, Seller shall sign and endorse for transfer all of Sellers right title and interest in and to five thousand six hundred sixty-six (5,666) shares of non-voting capital stock of the Company and fifty (50) shares of voting capital stock of the Company to Purchaser, Chris or Company as the parties shall agree.

1.2.15 Seller shall be permitted to retain access to the Company office and the Car Lot Building of the Company to retrieve all of Sellers personal belongings. Seller shall endeavor to remove his personal property as soon as possible after the closing but in any event, not later than 5 pm on February 6, 2021.

1.2.16 The parties agree that the Company is purchasing/redeeming 1200 of the total of five thousand seven hundred sixteen (5716) shares of the capital stock purchased pursuant to this Agreement.  Christopher Lane individually is purchasing four thousand five hundred sixteen (4516) of the total of five thousand seven hundred sixteen (5716) shares, including all voting shares purchased pursuant to this Agreement.

1.2.17 Seller, Chris and Company understand and recognize the restrictions on the transfer and sale of stock of the Company contained in the Shareholders Agreement.  Seller, Chris and Company collectively and individually waive

7

**Exhibit A**

any and all requirements and or restrictions contained in the Shareholder Agreement concerning the transfer or sale of stock in the Company.

**ARTICLE II**

**SECURITY FOR NOTE A AND NOTE B**

2.1    _Security_. Chris and Company understand and agree that Note A and Note B shall be secured by the following:

2.1.1  Purchaser shall, on the Closing Date, execute a Stock Pledge Security Agreement, a copy of which is attached hereto as Schedule 2.1.1 and incorporated herein by this reference, assigning to the Seller, as additional collateral for the performance of Purchaser under the Promissory Notes and Loan Documents, all of purchasers right, title and interest in and to the five thousand six hundred sixty six (5,666) shares of non-voting capital stock of the Company and fifty (50) voting shares of capital stock of the Company being transferred herein.  For so long as Purchaser is not in default under the Note A, Purchaser shall retain the right and enjoyment of such shares including all distribution there from.   Upon default, of Note A, Seller shall be permitted to exercise any and all rights under the Stock Pledge Security Agreement in relation to the shares of capital stock pledged.  Except upon the occurrence of an uncured Default on Note A, Seller shall not execute upon the Shares of the Company pledged as security unless the other collateral securing Note A is insufficient to satisfy the Default amount including but not limited to any acceleration of Note A

2.1.2  The Stock Pledge Security Agreement shall remain in place for so long as Purchaser remains default free and in compliance with Note A, .  Upon the timely payment in full of Note A, Seller shall revoke cancel and release the Stock Pledge Security Agreement and transfer and execute any and all documents necessary to provide unrestricted and unencumber ownership of the fifty (50) shares of voting capital stock in the Company and the five thousand six hundred sixty-six (5,666) shares of non-voting capital stock of the Company to Chris or the Company outright free and clear of any restrictions.  In the event of an uncured default in the payment of Note A, Seller may exercise any and all rights under the Stock Pledge Security Agreement.

2.1.3  Chris and Company agree that, in the event that the Company makes a monetary recovery in any litigation by the Company and its shareholders

8

**Exhibit A**

against Ronald Lane individually (the "Ron Lane litigation") Chris and the Company will utilize up to fifty percent (50%) of any Net Proceeds, if collected in cash, to pay down or off the then-remaining balance(s) of Note A and/or Note B.  Any monetary recovery from the Ron Lane litigation utilized in this manner shall be applied against the outstanding balance, if any, of Note A first then any remaining proceeds applied against the outstanding balance, if any, of Note B.  In the event that the Net Cash Recovery from the Ron Lane litigation exceeds the outstanding balance(s) of Notes A and/or B at the time of such recovery, Seller shall have no right, claim or entitlement to any amounts or portion of such Net Recovery in excess of the then outstanding principal amounts of Note A and Note B. In the event the recovery encompasses the transfer or retention of any tangible personal property or real property, then and in that event, Seller shall receive an additional security interest in such recovery of tangible personal property or real property securing the payment of Note A and Note B. Seller, Purchaser, Chris, and Company shall take all steps necessary and execute any and all documents necessary to put such security interest or interests in place.  Seller shall, upon payment in full of Note A, fully and completely release any such security interest.  For purposes of this provision, "Net Proceeds" shall mean the gross amount of the recovery less all applicable attorney fees and litigation costs directly incurred in the prosecution of the litigation.

       2.1.4 On the Closing Date, Company shall execute a first position mortgage in favor of the Seller, securing the payment of Note A, against the property know to the parties as the ("Houston Property") and more particularly described as all that certain parcel of land located in North Strabane Township, Washington County, Pennsylvania and of record in the office of the Recorder of Deeds, of Washington County Pennsylvania, instrument number 201073560 recorder on February 6, 2017. Additionally, on the Closing Date Company shall execute a second position mortgage on the Houston Property securing the payment of Note B.  Purchaser may if necessary, in Purchasers discretion, place a lien on the property with a third party for the funds necessary to make the timely payment of the second or third installment under Note A. Additionally, Purchaser shall be permitted to sell the Houston Property for purposes of making the timely payment of the second or third installment payment on Note A.  In the event Purchaser so chooses to use the Houston Property as collateral for funds from a

**Exhibit A**

third party to make the second or third installment, Seller shall subordinate or release his secured position as may be necessary to such third-party lender or to facilitate the sale of the Houston Property. Provided however, that the first One Million Dollars ($1,000,000.00) of funds received from any such use of the Houston Property as collateral by Company or Chris to secure funding, shall be immediately paid to the Seller and applied against Note A. Any funds in excess of the first One Million Dollars ($1,000,000.00) derive from the mortgaging, encumbrance or sale of the Houston Property may be retained by the Company and utilized at the Company's discretion. Upon the payment in full of Note A, Seller shall release any and all his  mortgages held by Seller against the property known as the Houston Property in Washington County Pennsylvania.

2.15   Company shall upon resolution of the dispute with Ronald Lane execute a first position deed of trust in favor of the Seller, securing the payment of Note A and Note B, against the property know to the parties as ("Alpaca Property"),and more particularly described  the lower one half of the Alpaca Property located in Harrison County West Virginia and of record in the office of the Clerk of the County Commission of Harrison County West Virginia in Deed Book ___ at Page ___.   Additionally, Company shall execute a second position deed of trust against the Alpaca Property securing the payment of Note B.  Upon the payment in full of Note A the first position deed of trust shall be released by the Seller.  Upon the payment in full of Note A and Note B Seller shall release all his deeds of trust against the property known as the Alpaca Property in Harrison County, West Virginia.


2.1.6  On the Closing Date,  Company shall execute a first position deed of trust in favor of the Seller, securing the payment of Note B, against the property know to the parties as ("Sun Valley Two"), and more particularly described as a certain tract or parcel of land situate along Harrison County Route 50/39 (Sun Valley Road), in Coal District, Harrison County West Virginia and of record in the office of the Clerk of the County Commission of Harrison County West Virginia in Deed Book 1673 at Page 644. Additionally, on the Closing Date, Company shall execute a second position deed of trust against the Sun Valley 2 property securing the payment of Note A.  Upon the payment in full of Note A this second position deed of trust shall be released by the

**Exhibit A**

Seller.  Upon the payment in full of Note A and Note B Seller shall release his first position deed of trust against the property know as Sun Valley Two in Harrison County, West Virginia.

2.1.7  On the Closing Date, Company shall execute a first position deed of trust in favor of the Seller, securing the payment of Note B, against the property know to the parties as the ("Charleston Property") and more particularly described as those certain tracts or parcels of land located in Elk District Charleston West District and Charleston North District, Kanawha County West Virginia and of record in the office of the Clerk of the County Commission of Kanawha County West Virginia in Deed Book 2480 at Page 550.  Additionally, on the Closing Date, Company shall execute a second position deed of trust against the Charleston Property securing the payment of Note A. Upon the payment in full of Note A this second position deed of trust shall be released by the Seller.  Upon the payment in full of Note A and Note B, Seller shall release his first deed of trust against the property known as the Charleston Property in Kanawha County, West Virginia.

2.1.8  Seller and Purchaser understand and agree, that at any time after the payment of the first two installments of Note A, Purchaser shall be permitted to substitute collateral for Note A and or Note B by substituting like real property.  Any such substituted collateral shall have a loan to value of not more than sixty percent (60%) of the fair market value and shall be real property located in the State of West Virginia.  Purchaser shall provide, at Purchasers sole cost and expense, a certified appraisal of the fair market value ("FMV") of the proposed substitute collateral.  In the event, for any reason, Seller does not accept the appraisal submitted by the Purchaser, Seller may, at Seller's sole cost and expense, have a second appraisal completed and if the FMV of such second appraisal is within five percent (5%) of the Purchasers valuation, then and in that event the Purchasers valuation of FMV for the substitute collateral shall be accepted.  In the event the appraisals are not within five percent (5%) of each other, then the two appraisers shall nominate a third appraiser to review and reconcile the two appraisals and establish the FMV of the substitute collateral.  The determination of FMV by the third appraiser shall be final and the cost of the third appraiser shall be split by the parties.

**Exhibit A**

2.1.9 <u>Sequence of Collateral Execution</u>.   Upon the occurrence of an uncured Default of Note A or Note B, Seller shall not execute upon the Shares of the Company pledged as security unless the other collateral securing Note A and Note B is insufficient to satisfy the Default amount including but not limited to any acceleration of Note A.

2.10 <u>Cross Collateralization</u>.   Seller and Purchaser agree that, although Note A and Note B are cross-collateralized pursuant to the terms of this Agreement, Note A and Note B are not subject to cross-defaults.

## ARTICLE III

## <u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>

Seller represents and warrants to Purchasers to the best of his knowledge as follows:

3.1 <u>Ownership of Shares</u>.  The Seller is the absolute owner and holder of fifty (50) shares of voting capital stock of Company and five thousand six hundred sixty-six (5,666) shares of non-voting capital stock of the Company all of which, except for the encumbrance to Ronald Lane set forth in Section 1.2.2 of this Agreement, are fully paid and non-assessable and which are, except for the lien of Ronald Lane free and clear of all mortgages, claims, liens, security interests, charges and encumbrances. Except for the fifty (50) shares of voting capital stock of the Company and the four thousand two hundred thirty-four (4,234) shares of non-voting capital stock of the company currently owned by Purchaser Christopher Lane, to the best of Seller knowledge, there are no other issued or outstanding shares, warrants, rights, options, or other equity of Company owned by the Seller or anyone else.

3.2 <u>Legal Proceedings and Claims</u>.  There currently exists six lawsuits pending involving the Company namely, (i) ASM Logging, LLC, a West Virginia limited liability company v. Ronald Lane, Inc. a West Virginia corporation, pending in the Circuit Court of Harrison County West Virginia Civil Action Number 20-C-193-2; (ii) Richie County Economic Development Authority, a West Virginia County and Municipal Development Authority v. Ronald Lane, Inc. a West Virginia corporation, pending in the Circuit Court

12

**Exhibit A**

of Richie County West Virginia Civil Action Number 18-C-17; (iii) CNX Mainstream Partners, LP and CNX Water Assets, LLC (D/B/A) Convey Water Systems, LLC  v. Ronald Lane, Inc. a West Virginia corporation, pending in the Court of Common Pleas of Allegheny County, Pennsylvania Civil Division CD-18-015629;  (iv) Ronald Lane, Inc., Christopher Lane and Norman Lane v. Ronald Lane, pending in the Circuit Court of Harrison County West Virginia, Civil Action Number 21-C-12-2; and (v) Ronald Lane v. Christopher Lane, Norman Lane and Ronald Lane Inc. pending in the Circuit Court of Kanawha County West Virginia Civil Action Number 21-C-60 and suit brought by the Layman heirs and or Estate.  Except for the current litigation expressly set forth in this Agreement, the Seller, to the best of his knowledge, is aware of no claim, suit, action, arbitration or legal, administrative or other proceeding, or governmental investigation pending or threatened i) against Company or any of its assets (ii) against any of its employees, officers, directors, or shareholders or (iii) against the Seller.

3.3 <u>Conflicting Instruments</u>.   The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein will not, with or without the giving of notice or the passage of time, (i) conflict with or result in the breach of any of the terms and provisions of, or constitute a default under, any note, indenture, mortgage, deed of trust, agreement, or other instrument or restriction to which Seller is a party, (ii) violate or result in the violation of any law, order, rule, regulation, writ, injunction or decree of any government, governmental instrumentality, agency or body, arbitration tribunal, or court, domestic or foreign, having jurisdiction over Seller or his property.

3.4 <u>Authority and Consents</u>.  Seller has the power and authority to enter into, deliver and perform this Agreement and to consummate the transactions contemplated hereby, and no approval or consent of any person or governmental agency is necessary in connection with the transactions contemplated hereby.

3.5 <u>Other Interests</u>.   Except as stated herein, no corporation, partnership, individual, or other entity has an interest in or claim to the shares being transferred hereunder.

3.6 <u>Taxes.</u>  To the best of Seller' knowledge and belief all federal, state, county, city and other tax returns of Company required by law to be filed on or before the date of this Agreement have been timely filed and all federal, state, county, city and other tax

**Exhibit A**

assessments, fees, penalties and other charges which were required to be paid by Company on or before the date of this Agreement have been paid and none of such taxes, assessments, fees or other charges is delinquent.

3.7 <u>Bank Accounts</u>.   Purchaser shall retain the use of the current Company bank accounts and any funds remaining in said accounts shall be the property of the Purchaser and Company.  Seller and Purchaser shall within three (3) business days of the Closing Date cause Seller's name and signatory authority to be removed from all accounts.

3.8 <u>Insurance Policies</u>.   To the best of Seller's knowledge, Company has, during all years of its business activities, maintained in full force and effect policies of liability insurance to protect its assets and its officers and directors from general liability claims.  Subject to the requirements of Section 1.2.3 of this Agreement, the policies of insurance presently in force and all renewals will remain in full force and effect through the Closing Date and or the date specified in Section 1.2.3 of this Agreement and neither Company nor any of its officers or directors will take any action to terminate or take any action which will result in termination of any of the policies prematurely.

3.9 <u>Licenses and Compliance with Law</u>.   To the best of Seller knowledge Company has all licenses, permits, certificates, bonds, approvals and other such authorization necessary in order to enable it to conduct its business as said business is conducted on the date of this Agreement.

3.10 <u>Seller Post Closing Cooperation.</u> Seller shall at Closing or after Closing execute any and all documents required to consummate this transaction including but not limited to Stock transfer, Stock Pledge Security Agreement, the Ron Note, the Assignment and Assumption Agreement, the Deeds of Trust and Mortgages and the releases relating thereto, Company Resolutions, Company meeting confirmations and any and all other documents necessary to consummate the transaction as set forth in this Agreement.  Purchaser and Seller shall endeavor to obtain any and all such documents for execution at the time of closing.  However, the Parties agree to execute any additional documents required after closing necessary to consummate this transaction.  The requirements of this section shall apply to any and all documents regarding the sale of the shares, the payment of the Promissory Notes and the encumbrance and or release of the security for the Promissory Notes as set forth

14

**Exhibit A**

herein, in the Loan Documents, other documents and the operation of the Company up to and including the date of sale.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Purchasers represent and warrant to Seller as follows:

4.1 <u>Purchasers</u>.  Purchasers have the full power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.  Company is duly authorized and validly existing and in good standing under and in accordance with the laws of the State of West Virginia and each and every jurisdiction within which it conducts business.

4.2 <u>Compliance With Laws</u>.  Purchasers have complied with, and are not in violation of, applicable federal, state or local statutes, laws and regulations, including, without limitation, any applicable building, zoning or other law, ordinance or regulation.

4.3 <u>Litigation</u>.  Other than as expressly set forth in Section 3.2 of this Agreement, there is no suit, action, arbitration or legal, administrative, or other proceeding or governmental investigation pending or, to the best of Purchaser's knowledge, threatened against or affecting Purchaser or the Company or any property owned by them.

4.4 <u>Current Operations</u>.   That Purchaser Chris has been involved in the operations of the Company and since the acquisition of the voting shares of Ronald Lane.   As such Chris and Company represent that they accept and confirm as true and accurate the representations and warranties of the Seller.   Seller likewise has been involved in the operations of the Company. As such, Seller accepts and confirms as true and accurate the representations and warranties of the Purchaser.

4.5 <u>Agreement Will Not Cause Breach or Violation</u>.  The consummation of the transactions contemplated by this Agreement will not result in or constitute any of the following:

(a)   A default or an event that, with notice or lapse of time or both, would be a default, breach or violation of any lease, license, note, contract, commitment, indenture, mortgage or other agreement, instrument or arrangement to

**Exhibit A**

which Purchaser or the Company is a party or by which the Purchaser or the Company is bound.

(b)     An event that would permit any party to terminate any agreement or to accelerate the maturity of any indebtedness or other obligation of Purchaser or the Company; or

(c)     The creation or imposition of any lien, charge, or encumbrance on any of the properties of Purchaser or the Company or the stock acquired under this Agreement.

(d)     That the individual Purchaser is a natural person whose individual net worth or the joint net worth at the time of his purchase of the stock transferred under this Agreement is sufficient to warrant the investment contemplated by this Agreement.

(e)     That the Purchaser along with their advisors and representatives have sufficient knowledge and experience in financial and business matters and can evaluate the merits and risks of this purchase and have the financial means to make them able to bear the economic risk of this investment for an indefinite period of time.

4.6 <u>Due Diligence</u>.   The Purchaser has carefully examined the Schedules, attachments and representations of Seller referenced in this Agreement.   To Purchasers' knowledge, after due and deliberate inquiry and review of its records, the representations and warranties Purchaser are true, accurate and complete.  Purchaser has conducted such due diligence investigation as Purchaser and their advisors deem necessary to evaluate and analyze the operations of Company, is satisfied with the findings, and therefore enters into this Agreement with full and complete knowledge and understanding of the Company, its operations, its obligation, and its ownership.

4.7     <u>Purchaser Post Closing Cooperation.</u> Purchaser, Chris and Company shall at Closing or after Closing execute any and all documents required to consummate this transaction including but not limited to Stock Pledge Security Agreement, the Promissory Notes, the Assignment and Assumption Agreement, the deeds of trust, Company Resolutions, Company meeting confirmations and any and all other documents necessary to consummate the transaction as set forth in this Agreement. Purchaser and Seller shall endeavor to obtain any and all such documents for execution at the time of closing.  However, the Parties agree to execute any additional documents required after closing necessary to consummate this transaction.  The requirements of

16

**Exhibit A**

this section shall apply to any and all documents regarding the sale of the shares, the payment of the Promissory Notes and the encumbrance and or release of the security for the Promissory Notes as set forth herein, in the Loan Documents, other documents and the operation of the Company up to and including the date of sale.

4.8  <u>Seller's 401K</u>.  Chris and Company shall take any and all steps necessary to preserve the Company's match paid for the benefit of Seller, including but not limited to assuring vesting in such amounts in accordance with the options of the retirement plan documents.  Seller acknowledges that Chris and the Company will not modify, restate or alter the terms or provisions of the Company's 401K plan and that Seller's vested interest in the Plan is and shall be as governed by the Plan Documents as they exist as of the Closing of this transaction.

4.9 <u>Covenant Not To Compete</u>.    Seller, Purchaser, Chris and Company understand, acknowledge and agree that the shareholders of Company are subject to that certain Shareholder's Agreement which contains a Non-Compete and Non-Solicitation provision contained in Section 15 of said Shareholders Agreement. Purchaser, Chris and Company hereby expressly acknowledge, consent, and agree to fully waive any and all application of the Non-Compete and Non-Solicitation provision of Section 15 contained in the aforementioned Shareholder's Agreement as the same would otherwise apply to the Seller from the Closing Date forward.  Provided however, Seller agrees he will not work for or with Ronald Lane or any entity controlled by or affiliated with Ronald Lane for a period of three (3) years following the Closing Date.  It is expressly agreed and understood by the Company and Chris that Seller shall not be subject to any of the restrictions of the Non-Compete and Non-Solicitation provisions of the Shareholder's Agreement and that the Company and Shareholder waive any and all rights contained therein as the same pertains to the Seller, except, Seller agrees he will not work for or with Ronald Lane or any entity controlled by or affiliated with Ronald Lane for a period of three (3) years following the Closing Date.

## ARTICLE V

## <u>CONDITIONS TO PURCHASER' OBLIGATIONS</u>

Each and every obligation of Purchaser under this Agreement shall be subject to the satisfaction, on or before the Closing Date, of the following conditions:

**Exhibit A**

5.1 <u>Representations and Warranties True</u>.  The representations and warranties by Seller in this Agreement or in any other instrument delivered to Purchaser under this Agreement or in connection with the transfer of Shares shall be true and accurate as of the date when made and at and as of the Closing Date.

5.2 <u>Seller's Performance</u>.  Seller shall have performed and complied, in all material respects, with each and every covenant, agreement and condition required to be performed by it prior to or on the Closing Date.

5.3 <u>Seller Post Closing Cooperation.</u> Seller shall at Closing or after Closing execute any and all documents required to consummate this transaction including but not limited to stock transfer certificates, stock certificates, Company meeting confirmations and all other necessary corporate documents.  Purchaser and Seller shall endeavor to obtain any and all such documents for execution at the time of closing. However, the Parties agree to execute any additional documents required after closing necessary to consummate this transaction.  The requirements of this section shall apply to any and all documents regarding the sale of the shares, the payment of the Promissory Notes and the encumbrance and or release of the security for the Promissory Notes as set forth herein, in the security documents and the operation of the Company up to and including the date of sale.

5.4 <u>Contingency</u>.    It is expressly agreed and understood by the Parties that:

(a)    In the event Purchaser Chris shall after the execution of this Agreement and before final Closing, become disabled or in the event Purchaser Chris dies during this time period, Purchaser or Seller may declare this Agreement to be null and void.

(b)    Failure on the part of the Purchaser or Seller to consummate this transaction for any reason other than those set forth above shall be construed as a default. In the event of default by the other party, Purchaser or Seller may declare the Agreement to be null, void, and of no further consequence. The defaulting Purchaser or Seller shall be responsible in the event of such default for all attorney fees and costs of the other party relating to this transaction.

**Exhibit A**

## ARTICLE VI

## CONDITIONS TO SELLER'S OBLIGATIONS

Each and every obligation of Seller under this Agreement shall be subject to the satisfaction, on or before the Closing Date, of the following conditions.

6.1 Representations and Warranties True.  The representations and warranties by Purchaser in this Agreement or any other instrument delivered by Purchaser under this Agreement or in connection with the transfer of the shares shall be true and accurate as of the date when made and at and as of the Closing Date.

6.2 Payment of the Purchase Price.  Purchaser shall have paid the initial payment of the Purchase Price as set forth in Section 1.2.1 and assumed and executed the Assignment agreement set forth in Section 1.2.2 of this Agreement.

6.3 Execution of Promissory Notes.   Purchase shall have as of the Closing executed the Promissory notes as provided for in Sections 1.2.7, 1.2.8 and 1.2.9 of this Agreement.

6.4 Security Documents.  Purchasers shall have executed any and all documents required by the provisions of this agreement including but not limited to the Promissory Notes, deeds of trust, mortgages, assignments, pledges, title transfers and all other or related documents necessary to consummate the transaction as contemplated hereby.

6.5 Transfers of Assets and Property.  Purchaser shall have made the transfers of property to NGL, LLC as provided for in Sections 1.2.3, 1.2.4 and 1.2.5 of this Agreement.

6.6 Purchaser's Performance.  Purchaser shall have performed and complied, in all material respects, with each and every covenant, agreement and condition required to be performed by Purchaser prior to or on the Closing Date.

## ARTICLE VII

## CLOSING; CLOSING DATE

7.1 Closing Date.  The Closing ("Closing") shall be held on or before the 29th day of January 2021 ("Closing Date"), at the offices of Gianola, Barnum, Bechtel and Jecklin, L.C., 1714 Mileground Road, Morgantown, West Virginia, or at such time and place as the parties may agree upon. The Parties understand, agree and acknowledge that the Parties may be required to execute documents and obtain closing information

**Exhibit A**

after Closing Date.  Notwithstanding, the Parties expressly understand and agree that all documentation and obligations as contained herein shall in all respect be executed, transferred, recorded and perfected as soon as possible and in any event not later than the dates specified in this Agreement.   Notwithstanding the parties understand and agree that the effective date of the transfer of the capital stock to the Purchaser and the payments and transfers to the Seller shall be effective as of the Closing Date.  Time is of the essence in the performance of any and all obligations under this Agreement.

7.2 Obligation of Seller at Closing.

(A) Seller shall cause to be delivered to Purchaser at the Closing the following instruments:

(1) An Assignment and/or stock power or certificates endorsed in blank transferring the Shares to Purchaser as required herein, in form and substance reasonably satisfactory to Purchaser and its counsel.

(2) A certificate from the Seller reaffirming Seller' representations and warranties and certifying that all conditions precedent to the Closing have been satisfied.

(3) The resignation of Seller from all positions as officer, director, and employee of Company effective as of the Closing Date.

(4) A release executed by Seller releasing, discharging and forever acquitting Company and Purchaser from any and all duties, obligations, debts and responsibilities growing out of Seller's prior services or activities as an officer, employer, director, shareholder, lender and other relations with Company except as otherwise contained herein.

(B) Seller agrees to execute and deliver, after the Closing, any additional assignments, documents and instruments of transfer reasonably requested by Purchaser, and will take any other steps consistent with the terms of this Agreement as are requested by Purchaser for the purposes of assigning, transferring, granting, conveying or conferring to Purchaser the Shares and the beneficial enjoyment thereof and to place Company in full and complete enjoyment of its business assets, properties and rights as represented and contemplated herein.

7.3 Obligations of Purchaser at Closing.

**Exhibit A**

(a)   Purchaser shall pay the purchase price due the Seller by check, cash, certified funds, or electronic transfer of funds, execute and deliver the Promissory Notes, Stock Pledge Security Agreement, Deeds of Trust, Mortgages and preformed all other transfers, deeds, assignments, obligations and document execution all in accordance with the provisions of this Agreement.

(b)   Purchaser shall have executed any and all documents, deeds, deeds of trust, mortgages, assignments and pledges all as required by and in accordance with Article II of this Agreement.

(c)   Purchaser shall obtain the written release of Seller from any personal guaranty or personal obligation of any kind character or nature of the Seller in relation to any operating accounts and or operations of the Company.

(d)   Purchaser shall release and indemnify Seller from any and all obligations of any kind, character or nature of the Company including but not limited to the pending litigation set forth in Section 3.2 of this Agreement.

(e)   Purchaser shall use their best efforts to obtain the release of the Seller from and indemnify and hold harmless the Seller from any and all liability, obligation, costs fees or expenses related to or resulting from any litigation against the Company of the Seller as a result of Sellers ownership, employment or other relationship with the Company with the exception of such future claims as may arise from any act or omissions of Seller that are proven to be knowingly fraudulent, deliberately dishonest, or to constitute willful misconduct, gross negligence or criminal conduct of Seller, or which conduct is determined .by a court having jurisdiction in the matter to constitute conduct that may not lawfully be indemnified.    .

(f)   Purchaser agrees to execute and deliver at the Closing any additional assignments, documents, instruments of transfer reasonably requested by Seller and will take all other steps consistent with the terms of this Agreement as are requested by Seller for the purpose of fulfilling the goals and purposes of this agreement.

(g)   The Company, Chris and Norman all understand and agree that the parties WILL NOT make any elections under Section 338 of the Internal Revenue Code regarding this transaction.

**Exhibit A**

## ARTICLE VIII

## OBLIGATIONS AFTER CLOSING DATE

8.1 <u>Indemnification of Purchaser and Company</u>.  Seller shall indemnify Purchaser and Company and all of its officers, directors, and affiliates against and hold them harmless from any and all claims, demands, suits, proceedings, judgments, losses, liabilities, damages, costs and expenses of every kind and nature (including, but not limited to, reasonable attorneys' fees and expert fees) required to be paid by such indemnified parties as a result of:

(a) The breach or inaccuracy of any warranty, representation or covenant made by Seller in this Agreement or any document delivered pursuant to this Agreement.

(b) The non-performance by Seller of any covenant, agreement or obligation imposed upon Seller under this Agreement.

(c) The intentional or willful misconduct of the Seller.

8.2 <u>Indemnification of Seller</u>.  Purchaser, Company and Chris shall indemnify Seller and his heirs, executors, trustees, and assigns against and hold them harmless from, any and all claims, demands, suits, proceedings, judgments, losses, liabilities, damages, costs and expenses of every kind and nature (including, but not limited to, reasonable attorneys' fees) required to be paid by such indemnified parties as a result of:

(a)   The breach or inaccuracy of any warranty, representation or covenant made by Purchaser in this Agreement or any document delivered pursuant to this Agreement.

(b)   The non-performance by Purchaser of any covenant, agreement or obligation imposed upon Purchaser under this Agreement.

(c)   Any liability, debt, or obligation, of any kind, character, or nature whether financial or otherwise, as set forth in this Agreement or as otherwise arising out of or connected in any way with the operation of Company and the employment of the Seller prior to or after the date of the sale with the exception of such future claims as may arise from any act or omissions of Seller that are proven to be knowingly fraudulent, deliberately dishonest, or to constitute willful misconduct, gross negligence or criminal conduct of Seller, or which conduct is determined .by a court having

**Exhibit A**

jurisdiction in the matter to constitute conduct that may not lawfully be indemnified.

.

(d)     Any obligation, promissory note, trade account, or other indebtedness of any kind character or nature of the Company or Purchaser Chris and not paid when due.

(e)     Any and all litigation by or against the company including but not limited to the following and ongoing litigation: (i) ASM Logging, LLC, a West Virginia limited liability company v. Ronald Lane, Inc. a West Virginia corporation, pending in the Circuit Court of Harrison County West Virginia Civil Action Number 20-C-193-2; (ii) Richie County Economic Development Authority, a West Virginia County and Municipal Development Authority v. Ronald Lane, Inc. a West Virginia corporation, pending in the Circuit Court of Harrison County West Virginia Civil Action Number 18-C-17; (iii) CNX Mainstream Partners, LP and CNX Water Assets, LLC (D/B/A) Convey Water Systems, LLC v. Ronald Lane, Inc. a West Virginia corporation, pending in the Court of Common Pleas of Allegheny County, Pennsylvania Civil Division CD-18-015629; (iv) Ronald Lane, Inc., Christopher Lane and Norman Lane v. Ronald Lane, pending in the Circuit Court of Harrison County West Virginia, Civil Action Number 21-C-12-2; and (v) Ronald Lane v. Christopher Lane, Norman Lane and Ronald Lane Inc. pending in the Circuit Court of Kanawha County West Virginia Civil Action Number 21-C-60.

(f)     Any and all obligations of the Company and or Seller in relation to any and all loans obtained thru the Payroll Protection Plan (PPP).   Seller shall cooperate with Company and Purchaser in obtaining forgiveness of the PPP loan.

8.3     <u>Accuracy and Survival of Warranties and Representations.</u>

(a) Neither Seller nor Purchaser shall take or omit to take or cause   any action which would cause any of this Agreement not to be true in any material respect on and as of the Closing Date with the same force and effect as if such representations and warranties had been made on and as of the Closing Date; and the parties hereto will use their best efforts to cause to be performed all conditions to the Closing required to be performed by them.

(b) All indemnities, representations, warranties and agreements of Seller and Purchaser made under and pursuant to this Agreement, or any documents delivered pursuant thereto, shall survive the Closing Date for a period of the greater of

**Exhibit A**

five (5) years or until the payment in full of the Promissory Notes. All statements contained herein or in any Schedules, Attachments or any other documents delivered pursuant hereto or in connection with the transaction contemplated hereby shall be deemed to be representations and warranties.

8.4 <u>Notice and Opportunity to Defend</u>. Promptly after receipt by any party hereto of notice of (a) any claim or (b) the commencement of any action or proceeding, such party will, if a claim with respect thereto is to be made against any party obligated to provide indemnification (the "Indemnifying Party") pursuant to this Article, give the Indemnifying Party written notice of such claim or the commencement of such action or proceeding. The Indemnifying Party shall have the right, at its option, to compromise or defend, at its expense by its own counsel, any such matter involving the asserted liability of the party seeking indemnification (the "Indemnified Party"). Such notice, and the opportunity to compromise or defend, shall be a condition precedent to any liability of the Indemnifying Party under the indemnification agreements contained in this Article. In the event that the Indemnifying Party shall undertake to compromise or defend any such asserted liability, it shall promptly notify the Indemnified Party of its intention to do so, and the Indemnified Party shall cooperate fully with the Indemnifying Party and its counsel in the compromise of, or defense against, any such asserted liability. In any event, the Indemnified Party shall have the right to participate in the defense of such asserted liability.

8.5   <u>Stock Registration Documentation</u>. Parties understand and agree that as structured the Company and Christopher Lane are collectively identified as Purchaser and are jointly and severely obligated to perform all of the obligations of the Purchaser under, according and pursuant to this Agreement, the Promissory Notes, the Loan Documents, and all related documents to this transaction.   As such the parties understand, consent and agree to coordinate the allocation of shares purchased by Chris and Company with the Company accountant so as to minimize as much as possible the tax effect of this transaction.  Therefore the parties agree to execute any additional documentation, stock consents and other necessary documentation as my be necessary to allocate the shares to the respective Purchasers and to document this transaction as needed.

**Exhibit A**

8.6 <u>Confidentiality and Nondisclosure</u>.   The parties to this Agreement understand, acknowledge, accept and agree that this Agreement, its terms, conditions and obligations shall be maintained in strict confidence by the Norman, Christopher and the Company, with disclosure allowed only to the Parties' respective accountants and attorneys as may be necessary to implement its terms and for tax purposes.   The parties further agree that to the extent necessary to consummate the transaction contemplated by this Agreement limited specific disclosures may be made to employees essential to completing the transaction.   The Parties will require that such persons and professionals also keep the settlement terms in confidence.   Upon receipt of a demand for production, subpoena, etc. the party receiving such demand or subpoena seeking disclosure of the confidential terms shall give prompt written notice to the other parties in order to all appropriate efforts to resist the production of the confidential information.

8.7 <u>Nondisparaging</u>.  Seller, Chris and Company understand and agree that no party will disparage the other or any of its officers, directors, owners, shareholders, members or managing agents, including through online reviews or social media sites. This nondisparaging provision shall include but not be limited to disparaging or derogatory comments to third parties, employees, financial institutions or other parties. If either party believes that the other has made statements or comments which are deemed to be disparaging, they will discuss the same in an effort to resolve the issue prior to seeking court intervention. If they are unable to resolve their issue, the aggrieved party may file a petition with a court of competent jurisdiction to obtain a restraining order to prevent the offending party from making further disparaging comments.

8.8 <u>Liquidated Damages</u>.  The parties understand and agree that any violation of the provisions of Sections 8.6 and 8.7 above would result in irreputable damage to the other party and the calculation of damages would be difficult or impossible to quantify. As such the parties agree that any violation of the provisions of Sections 8.5 and 8.6 of this agreement shall entitle the damaged party to damages by a court of competent jurisdiction and the parties agree that such damages shall be a minimum of Five Thousand Dollars ($5,000.00).

**ARTICLE IX**

**Exhibit A**

**MISCELLANEOUS**

9.1 <u>Expenses.</u>   Upon consummation of this transaction, all costs and expenses incurred or to be incurred by the Seller in negotiating and preparing this Agreement and carrying out the transactions contemplated hereby shall be paid by the Seller.   Upon consummation of this transaction, all costs and expenses incurred or to be incurred by the Purchaser in negotiating and preparing this Agreement and carrying out the transactions contemplated hereby shall be paid by the Purchaser.   Parties agree that Company shall reimburse Seller for such legal fees paid to Gianola Barnum Bechtel & Jecklin L.C. relating work performed by Gianola Barnum Bechtel & Jecklin, L. C. for the benefit of the in the Company's property disputes with Ronald Lane.   The parties understand and agree that the reimbursement amount shall be Thirty-Six Thousand Seven Hundred Sixty Five Dollars ($36,765.00) and shall be paid by the Company..

9.2 <u>Storage Area</u>.  The parties understand and agree that Seller currently has his personal camper parked and stored in the old shop building of the Company.  Seller and Purchaser agree that Seller shall be permitted to continue to use such area for the storage of his camper without charge until such time as needed by the Company. Company shall provide Seller with as much notice as possible, and in any event not less than thirty (30) days, of the Company's need for the space and the need for Seller to vacate the premises.

9.3 <u>Effect of Headings</u>.   The subject headings of the articles, sections and subsections of this Agreement are included for purposes of convenience only and shall not affect the construction or interpretation of any of the provisions hereof.

9.4 <u>Risk of Loss</u>.  In the event of the material loss or damage to the business assets of Company at or prior to Closing, the Purchaser may, at his option, (i) terminate this Agreement and the parties' rights and responsibilities hereunder, or (ii) proceed to Closing the transaction and have no further rights or remedies against Seller (other than as set forth in this Agreement for any damage except to the extent of any insurance proceeds under any insurance policies insuring Company or its business and assets).

9.5 <u>Entire Agreement; Modification; Waiver</u>.   This Agreement, the Promissory Notes and Loan Documents contain the entire agreement between the parties pertaining to the subject matter contained herein, and supersedes all prior and

**Exhibit A**

contemporaneous agreements, representations and understandings of the parties. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all the parties. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute a waiver of any other provision, whether similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

9.6 <u>Counterparts</u>.  This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.7 <u>Parties in Interest</u>.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third persons any right of subrogation or action over or against any party to this Agreement.

9.8 <u>Assignment.</u>  This Agreement shall be binding on, and shall inure to the benefit of, the parties to it and their respective heirs, legal representatives, successors, and assigns.

9.9 <u>Dispute Resolution</u>.  All claims, disputes and controversies connected with, related to or arising out of: (i) this Agreement (including questions of interpretation, execution and enforcement); (ii) the transactions contemplated by this Agreement; (iii) all other business or financial matters by and between the parties shall be settled and determined by submitting the dispute to mediation. If mediation is not successful, the Parties shall be permitted to institute such legal proceedings as are necessary to resolve the dispute.  Resort to mediation shall be a condition precedent to the institution of any litigation.  In any litigation, the ruling Court(s) shall award costs, expenses and reasonable attorney's fees to the substantially prevailing party.

9.10 <u>Waiver of Trial by Jury.</u> The Parties to this Agreement shall and do hereby waive trial by jury in any action, proceeding or counterclaim brought by either party hereto by the other on any and all matters whatsoever arising out of or in any way connected with this Agreement, or for the enforcement of any remedy under any statute,

**Exhibit A**

emergency or otherwise.  The Parties agree that any litigation shall be by bench trial in the Circuit Court of Harrison County, West Virginia.

9.11 Notices.

(a) All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or on the second day after mailing if mailed to the party to whom notice is given, by first class mail, registered or certified, postage prepaid, and properly addressed as follows:

To Seller:

    Norman Lane
    974 Nicut Road
    Orma, West Virginia  25268

With a Copy to:

    James A. Gianola
    1714 Mileground Road
    Morgantown, WV 26505

To Purchaser:

    Christopher Lane
    317 Buckhannon Avenue
    Clarksburg, Wet Virginia 26301

    Ronald Lane Inc.
    c/o Christopher Lane
    339 Wilsonburg Road
    Clarksburg, West Virginia 26301

With a Copy to:    Daniel Taylor
    535 Smithfield Street
    Suite 1100
    Pittsburgh, PA  15222

(b) Any party to this Agreement may, by notifying the other parties hereto, designate any additional or different address to which subsequent notices, requests, demands, and other communications shall be sent.

**Exhibit A**

8.12 <u>Severability</u>.   In the event any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

8.13 <u>Governing Law</u>.   This Agreement shall be governed by and construed in accordance with the laws of the State of West Virginia.   The Parties hereto agree, consent and submit to the jurisdiction and venue of the Circuit Court of Harrison County, West Virginia.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed, delivered and sealed all as of the date first above written.

SELLER:                                                    PURCHASER:

_____                    _____
Norman Lane                                           Christopher Lane



RONALD LANE, INC.

_____
By:     Christopher Lane·
Its:     President

29

**Exhibit A**