## STOCK PLEDGE SECURITY AGREEMENT

**THIS STOCK PLEDGE SECURITY AGREEMENT,** together with all exhibits, riders or other documents attached hereto, as any or all may be amended or modified from time to time, ("Security Agreement") is made as of this ___ day of January, 2021, by and between **RONALD LANE INC.** a West Virginia corporation, whose address is 339 Wilsonburg Road Clarksburg, WV 26301 ("Company") **and CHRISTOPHER LANE,** whose address is 317 Buckhannon Avenue Clarksburg, WV 26301 ("Chris") Chris and Company are collectively referred to as ("Debtor"), and **NORMAN LANE,** whose address is 974 Nicut Road, Orma WV 25268 ("Secured Party").

### WITNESSETH:

The Debtor and the Secured Party have entered into certain Stock Purchase Agreement dated January 29, 2021 in which Debtor purchased from Secured Party his ownership interest in the Company (the "Purchase Agreement"), pursuant to which the Debtor has executed two Promissory Notes, Note A and Note B of even date herewith in the principal amount of Three Million Dollars ($3,000,000.00) and Two Million Three Hundred Sixty Three Thousand Dollars ($2,363,000.00) respectively, payable to the Secured Party (the "Loan"), and the Debtor has agreed to execute this Security Agreement and grant to the Secured Party a security interest in the Collateral (as hereinafter defined). Capitalized terms used but not otherwise defined herein shall have the same meanings as set forth in the Uniform Commercial Code, as in effect on the date of this Agreement and as may be amended, modified, or supplemented from time to time (the "Uniform Commercial Code").

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. **SECURITY INTEREST.** Debtor, intending to be legally bound, hereby pledges, transfers, assigns, and grants to Secured Party, a continuing security interest ("Security Interest") in the following described personal property: fifty (50) shares of voting capital stock in the Company and five thousand six hundred sixty-six (5,666) shares of non-voting capital stock in the Company, together with all present and future renewals, replacements, substitutions, increases in value, security entitlements with respect thereto, rollovers, extensions, additions, interest, and earnings thereon, rights, accessions thereto, now existing or hereafter arising and all Proceeds thereof ("Collateral").

2. **INDEBTEDNESS SECURED.** The Security Interest granted by Debtor and Shareholders secures the full payment of the Loan and all loans, advances, debts, liabilities, indebtedness, obligations, or modifications of the Loan of any kind or character owing by Debtor to Secured Party arising under this Agreement, the Promissory Notes, Loan Documents as defined in the Promissory Notes, the Stock

4828-1000-2213.v1                                                                    **Exhibit F**

Purchase Agreement, and any amendments, extensions, renewals or increases thereof, including, but not limited to, all principal, interest, charges, expenses, reasonable attorneys' fees and expenses related to the collection of the foregoing, and any other amounts payable by Debtor under this Agreement whether executed in connection herewith or otherwise (collectively, the "Indebtedness").

3.  **REPRESENTATIONS AND WARRANTIES OF DEBTOR.** Debtor represents and warrants and, so long as this Agreement is in effect, shall be deemed continuously to represent and warrant that:

(a) Each Instrument and interest constituting Collateral is genuine and in all respects what it purports to be.

(b) Debtor is the owner of the Collateral, which is registered respectively in the name of the Debtor, free and clear of all security interests, liens or other encumbrances, except this Security Interest.

(c) Debtor has the power and authority to own the Collateral, to grant the Security Interest and to enter into and perform this Agreement and any other document or instrument delivered in connection herewith.

(d) There are no restrictions on the pledge or transfer of any of the Collateral, other than restrictions, if any, referenced on the face of any certificates evidencing the Collateral or as contained in any Shareholder Agreements, or as contained in the Bylaws of the Company as constituted as of the date of this Agreement.

(e) All ownership interests and other instruments or documents comprising or evidencing the Collateral are being transferred to Secured Party, together with undated powers, instruments or other documents duly endorsed in blank by Debtor and further, and Debtor shall deliver to and deposit with Secured Party in pledge all such certificates, securities, instruments or other documents.

(f) Chris and Company understand and agree that Company shall not issue and additional shares to Chris or any third party without the express written consent of the Secured Party. Such consent by the Secured Party shall besole at Secured Party's discretion.

4.  **COVENANTS OF DEBTOR.**

(a) Debtor will defend the Collateral against the claims and demands of all other parties including, without limitation, defenses, setoffs, claims and counterclaims asserted by any obligor against Debtor and/or Secured Party, will keep the Collateral free from all security interests, liens or other encumbrances, and will not sell, transfer, lease, assign, deliver or otherwise dispose of any Collateral or any interest therein without the prior written consent of Secured Party.

**Exhibit F**

(b) Debtor will keep, in accordance with generally accepted accounting principles consistently applied, accurate and complete records concerning the Collateral, and at Secured Party's request, Debtor will mark any and all such records to indicate the Security Interest and will permit Secured Party or its agents to inspect the Collateral and to audit and make extracts from such records no more than once per calendar quarter.

(c) Without thirty (30) days prior written notice to Secured Party, Debtor will not (i) change his addresses or contact information, or (ii) relocate to another state or jurisdiction.

(d) Debtor will pay all taxes, assessments and other charges of every nature which may be levied or assessed against the Collateral or the income derived from the Collateral, other than taxes, assessments, fees and charges being contested in good faith by appropriate proceedings being diligently pursued; and

(e) Debtor will execute and deliver to Secured Party such assignments and other documents and will take such other actions relating to the Security Interest and the perfection thereof as Secured Party may reasonably request and will pay all costs of filing financing statements, assignments and other documents in all public offices requested by Secured Party.

(f) Debtor shall provide Lender annual financial statements as of December 31 of each year of Debtor, including at least a balance sheet and income statement, prepared in accordance with generally accepted accounting principles consistently applied and will fairly present Debtor's financial condition as of such date and for such period. Such financial statements shall be provided on or before April 30 of each calendar year.

(g) Debtor shall notify Secured Party as soon as practicable upon the occurrence of any event or of any other matter which materially affects the operations, assets, properties, contract rights, liabilities or financial condition of the Collateral or Debtor including but not limited to: (i) pending or threatened claims, litigation or investigations of any kind character or nature against the Collateral or Borrower, (ii) the imposition of, or any attempt to impose, any lien or encumbrance of any kind on the Collateral of Secured Party or Debtor, (iii) the default by Debtor in the payment of any debt or obligation owed by him when due, and (iv) any default or any condition or situation which would constitute default with the passage of time under any loan documents or other agreements or contracts, written or oral, to which Debtor is a party.

5. **INCOME FROM COLLATERAL.**

(a) Debtor and Secured Party understand and agree that any and all

**Exhibit F**

distributions from the Collateral shall be paid to the Debtor and the Secured Party consents to such distributions. Secured Party reserves the right to revoke this consent at any time upon notice to the Debtor of default by the Debtor in the payment of the Promissory Notes, Loan Documents as defined in the Promissory Notes, the Stock Purchase Agreement, deeds of trust, assignments, or other Security provided for in the documents.

(b)   In the event of a default by the Debtor, any payment from the Collateral received by the Debtor, shall be held by Debtor in trust for Secured Party in the same medium in which received, shall not be commingled with any assets of Debtor and shall be delivered to Secured Party in the form received, properly indorsed to permit collection, not later than the next business day following the day of its receipt in accordance with the terms of the Note, Loan Documents and other Security Agreement. Secured Party may apply the net cash receipts from such payment to payment of any of the Indebtedness, provided that Secured Party shall account for and pay over to Debtor any such payment remaining after payment in full of the Indebtedness.

6.   **EVENTS OF DEFAULT.**

(a)   Upon the occurrence of an Event of Default, Secured Party's rights and remedies with respect to the Collateral shall be those of a Secured Party under the Uniform Commercial Code and under any other applicable law, as the same may from time to time be in effect, in addition to those rights granted herein and in any other agreement now or hereafter in effect between Debtor and Secured Party. Without in any way limiting the foregoing, Secured Party, upon the occurrence and during the continuance of an Event of Default, may at any time and from time to time, with or without judicial process, take control of the collateral including but not limited to any and all voting rights and operational aspects of the collateral; and or dispose of any Collateral at any place or time and to any person, persons, or entities designated by Secured Party. Secured Party may apply the net proceeds actually received from the operation of the collateral or any sale or other disposition of the collateral to the reasonable expenses of retaking, holding, operating preparing for sale, selling, leasing and the like, to reasonable attorney's fees and all legal, travel and other expenses incurred by Secured Party in attempting to collect any part of the Indebtedness or enforcing this Agreement; and then to the Indebtedness in such order of application as Secured Party may elect; and Debtor shall remain liable and will pay to Secured Party on demand the amount of any deficiency remaining, together with interest thereon at the highest rate then payable on the Indebtedness. In addition, Secured Party may transfer the Collateral into its name or that of its nominee and may exercise all voting rights with respect to the Collateral, but no such transfer shall constitute a taking of such Collateral in satisfaction of the Indebtedness unless Secured Party so indicates by written notice to Debtor. After such transfer, Secured Party shall also be entitled to receive any all dividends or distributions paid or declared on the Collateral.

(b)   Without in any way requiring notice to be given in the following manner, Debtor agrees that any notice by Secured Party of sale, disposition or other

**Exhibit F**

intended action hereunder or in connection herewith, whether required by the Uniform Commercial Code or otherwise, shall constitute reasonable notice to Debtor if such notice is mailed by regular mail, postage prepaid, or by overnight courier at least ten (10) days prior to such action, to the address set forth above as the location of Debtor or to any other address which Debtor has specified in writing to Secured Party as the address to which notices hereunder shall be given to Debtor.

(c) Debtor agrees to pay on demand all reasonable costs and expenses incurred by Secured Party or any affiliate of Secured Party in enforcing this Agreement, in realizing upon or protecting any Collateral and in enforcing and collecting any Indebtedness, including, but not limited to, if Secured Party retains counsel for advice, suit, insolvency proceedings or any of the above purposes, the reasonable counsel's fees and expenses incurred by Secured Party.

7. **MISCELLANEOUS.**

(a) Debtor hereby appoints Secured Party as attorney-in-fact of Debtor, irrevocably and with power of substitution, in the same manner, to the same extent and with the same effect as if Debtor were to do the same to file financing statements relating to the Collateral or to execute and file any such financing statement in Debtor's name, all as Secured Party may deem appropriate to perfect and continue the Security Interest; upon the occurrence and during the continuance of an Event of Default (i) to make, adjust or settle and receive payment on any insurance claims with respect to the Debtor; (ii) to endorse the name of Debtor on any instruments, documents or other evidences of the Collateral that may come into Secured Party's possession; (iii) to execute proofs of claim and loss; (iv) to execute endorsements, assignments or other instruments of conveyance or transfer; and (v) to perform all other acts which Secured Party deems appropriate to protect and preserve the Collateral and to enforce the terms of this Agreement. The agency hereunder is unconditional and shall not terminate until all of the Indebtedness is paid in full.

(b) Upon Debtor's failure to perform any of its duties hereunder, Secured Party may, but shall not be obligated to, perform any or all such duties, including, without limitation, payment of taxes, assessments, insurance and other charges and expenses as herein provided, and Debtor shall pay an amount equal to the cost thereof to Secured Party on demand of Secured Party. Payment of all moneys hereunder shall be secured by the Collateral.

(c) Upon and at any time and from time to time after demand or any occurrence or existence of any Event of Default, as applicable, Secured Party shall have the right to place an administrative hold on, and setoff against each obligation of Debtor pursuant to this Agreement, each obligation of Secured Party or any affiliate of Secured Party (in any capacity) owing to Debtor, whether now existing or hereafter arising or accruing, whether or not then due and whether pursuant to any deposit account or certificate of deposit or in any other manner. Such setoff shall become effective at the time Secured Party determines even though evidence thereof is not

**Exhibit F**

entered in the records of Secured Party until later.

(d) No course of dealing between Debtor and Secured Party and no delay or omission by Secured Party in exercising any right or remedy hereunder or with respect to any Indebtedness shall operate as a waiver thereof or of any other right or remedy, and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy. Secured Party may remedy any default by Debtor hereunder or with respect to any Indebtedness in any reasonable manner without waiving the default remedied and without waiving any other prior or subsequent default by Debtor. All rights and remedies of Secured Party hereunder are cumulative.

(e) Secured Party shall have no obligation to take, and Debtor shall have the sole responsibility for taking, any and all steps to preserve rights against any and all prior parties to any Instrument constituting Collateral, whether or not in Secured Party's possession. Secured Party shall not be responsible to Debtor for loss or damage resulting from Secured Party's failure to enforce or collect any such Collateral or to collect any moneys due or to become due thereunder. Debtor waives protest of any Instrument constituting Collateral at any time held by Secured Party on which Debtor is in any way liable and waives notice of any other action taken by Secured Party.

(f) The rights and benefits of Secured Party hereunder shall, if Secured Party so directs, inure to any party acquiring any interest in the Indebtedness or any part thereof.

(g) Secured Party and Debtor shall include the heirs, executors or administrators, or successors or assigns, of those parties.

(h) No modification, rescission, waiver, release, or amendment of any provision of this Agreement shall be made except by a written agreement subscribed by Debtor and by a duly authorized officer of Secured Party.

(i) This Agreement and the transaction evidenced hereby shall be construed under the laws of the State of West Virginia, as the same may from time to time be in effect. If any term of this Agreement shall be held to be invalid, illegal, or unenforceable, the validity of all other terms hereof shall in no way be affected thereby.

(j) To the fullest extent permitted by applicable law, Debtor shall not assert, and hereby waives any claim against Secured Party, on any theory of liability, for special, indirect, consequential or punitive damages (but excluding direct or actual damages) arising out of, in connection with or as a result of, this Agreement, or the transactions contemplated herein.

**Exhibit F**

(k)  This Agreement is and is intended to be a continuing Security Agreement and shall remain in full force and effect until all Indebtedness and any extensions or renewals thereof shall be finally and irrevocably paid in full.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**DEBTOR:**

**RONALD LANE, INC.**

By:  Christopher Lane
Its:  President

Christopher Lane, individually.

**SECURED PARTY:**

Norman Lane

**Exhibit F**